REBECCA HOYLE ELLEN, ANGELA ELLEN, FLORENCE OAKLEY, PLAINTIFFS V. A.C.
SCHULTES OF MARYLAND, INC., A.C. SCHULTES OF CAROLINA, INC., A.C.S. &
SONS, INC., JOHN O'BRIEN, AND WILLIAM JEFFERYS, DEFENDANTS

No. COA04-1320

(Filed 2 August 2005)

**Arbitration and Mediation— motion to compel denied—claims not based on contract**

Defendants' motion to compel arbitration was properly denied where plaintiffs were not seeking any direct benefits from the contracts containing the relevant arbitration clause.

Appeal by defendants from order entered 14 June 2004 by Judge John B. Lewis, Jr., in Onslow County Superior Court. Heard in the Court of Appeals 12 May 2005.

*Shipman Gore Mason & Wright, L.L.P., by Gary K. Shipman, William G. Wright, and Nicole Moss, for plaintiffs-appellees.*

*Daniel Lee Brawley and Barbara A. Samples, and Maupin Taylor, P.A., by Gilbert C. Laite, III, for defendants-appellants.*

TIMMONS-GOODSON, Judge.

A.C. Schultes of Maryland, Inc. ("AC Schultes"), A.C.S. & Sons, Inc. ("ACS"), John O'Brien ("O'Brien"), and William Jefferys ("Jefferys") (collectively, "defendants") appeal the trial court order denying their motions to compel arbitration of a suit filed by Rebecca Hoyle Ellen ("Rebecca"), Angela Ellen ("Angela"), and Florence Oakley ("Oakley") (collectively, "plaintiffs").[1] Because we conclude that the arbitration clause at issue is not enforceable against plaintiffs, we affirm the order of the trial court.

The facts and procedural history pertinent to the instant appeal are as follows: Plaintiffs are shareholders in Atlantic Coast Construction & Utility, Inc. ("ACCU"), a construction company specializing in water and sewer utilities work. In 1999, ACCU entered into a series of agreements with AC Schultes, whereby ACCU would serve as subcontractor on several construction projects awarded to and supervised by AC Schultes. Five of these projects were referred to as the "Water Wells," "SJAFB," "Potable Water Lines," "Burton,"

---

1. A.C. Schultes of Carolina, Inc. was dismissed pursuant to the trial court order and thus is not a party to the instant appeal.

and "Wash Racks" projects. The subcontracts of these five projects contained the following pertinent arbitration clause:

> Any controversy or claim between the Contractor and the Subcontractor arising out of or related to this Subcontract, or the breach thereof, shall be settled by arbitration . . . .

On several occasions in Spring 2000, officers of ACCU and AC Schultes met to discuss the proposed partial purchase of ACCU by AC Schultes. ACCU eventually turned down AC Schultes' proposals, and ACCU and AC Schultes continued to work with one another. However, the relationship between ACCU and AC Schultes subsequently deteriorated, and on 12 September 2001, AC Schultes filed a complaint against ACCU, requesting that the trial court require arbitration of all claims arising out of the Water Wells, SJAFB, Potable Water Lines, Burton, and Wash Racks projects. AC Schultes also requested a declaration of the financial obligations and liabilities of the parties on a sixth project, the North Lenoir project. The trial court thereafter ordered the parties to arbitrate all claims and controversies arising out of the projects.

On 3 January 2004, plaintiffs filed a complaint against defendants, alleging unfair and deceptive trade practices and tortious interference with prospective business advantages. In their complaint, plaintiffs allege that at or around the time ACCU declined AC Schultes' purchase attempts, O'Brien "began a course of inappropriate and unwanted sexual advances" toward Angela. Plaintiffs allege that although Angela "attempted to ignore [O'Brien's] behavior and continue the business relationship" between ACCU and AC Schultes, O'Brien continued to contact and harass Angela by "professing his love" for her and by "follow[ing] her to . . . pursue his desired illicit relationship." Plaintiffs assert that after repeated rejections, O'Brien "apparently got the message that [Angela] would not give in to his carnal desire" in December 2000. However, AC Schultes nevertheless "failed and refused to pay ACCU for work performed by ACCU and for materials supplied by ACCU on virtually all projects ACCU was working on."

According to plaintiffs' complaint, the relationship between ACCU and AC Schultes subsequently "broke down further, to the point that the principals of ACCU were taking personal money and obtaining personal loans to complete the projects ACCU had with [AC Schultes][.]" Jefferys and O'Brien thereafter allegedly "contacted ACCU vendors and subcontractors and slandered ACCU by stating

that ACCU would not pay its bills even though it had been paid by [AC Schultes], which they knew not to be true." Jefferys and O'Brien also allegedly "asked at least some vendors not to do further business with ACCU[,]" and "stated to ACCU vendors that [AC Schultes] was going to put ACCU out of business." Plaintiffs assert that Jefferys and O'Brien also "contacted ACCU employees and told them that ACCU was going to be put out of business and told them they should come to work for [AC Schultes] while they could[,]" and "filed fraudulent documentation with the Federal Government to obtain payment for work performed by ACCU, and then continued to withhold payment to ACCU for the work performed." According to plaintiffs, "[t]he actions of Jefferys and O'Brien were taken with the deliberate purpose of destroying the plaintiffs'[] business and reputations in the very limited field of utilities contracting[,]" and the actions "were taken in retaliation for [Angela's] refusal of [O'Brien's] illegal, unwanted and adulterous sexual advances toward her." Plaintiffs contend that the actions of Jefferys and O'Brien were on behalf of AC Schultes, and because ACS received profits from the operation of AC Schultes, it was a "knowing beneficiary" of the actions and thus should be responsible for the damages resulting from the alleged actions.

As a result of the alleged actions, plaintiffs assert that by August 2001, "all of ACCU's funds were exhausted, all of [plaintiffs'] funds were depleted, and all of their ability to obtain credit was depleted as well." Plaintiffs further assert that after the parties' "last attempt to resolve the payment issues" was unsuccessful, AC Schultes "almost immediately filed for arbitration on five projects for which it owed ACCU money and filed a lawsuit in Lenoir County[.]" AC Schultes thereafter allegedly "paid exorbitant amounts of money to other contractors for the purported purpose of completing the outstanding work[,]" in an effort to "establish[] enough 'back charges' against ACCU [so] as to cancel out all amounts owed to ACCU." Plaintiffs allege that "[a]s a direct result of the foregoing illegal actions, plaintiffs have lost their entire investment in the company as well as incurred substantial additional damages for loss of future earnings and return on capital," and further "lost the prospective business advantage of having vendors and subcontractors that will work with them to conduct future business in the utilities field, in a manner customary for that field."

On 19 February 2004, defendants filed a motion to dismiss plaintiffs' claim pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6). The trial

court subsequently denied defendants' motion, and on 23 April 2004, defendants filed separate answers to plaintiffs' complaint as well as separate motions to compel arbitration of the issues in the complaint. Following a hearing on the matter, on 14 June 2004, the trial court issued an order denying defendants' motions to compel arbitration. It is from this order that defendants appeal.

The only issue on appeal is whether the trial court erred by denying defendants' motions to compel arbitration. Defendants argue that plaintiffs and their complaint are subject to arbitration. We disagree.

We note initially that a trial court's decision to deny a motion to compel arbitration is interlocutory in nature. *See Raspet v. Buck*, 147 N.C. App. 133, 135, 554 S.E.2d 676, 677 (2001). Nevertheless, this Court has previously held that " '[t]he right to arbitrate a claim is a substantial right which may be lost if review is delayed, and an order denying arbitration is therefore immediately appealable.' " *Boynton v. ESC Med. Sys., Inc.*, 152 N.C. App. 103, 106, 566 S.E.2d 730, 732 (2002) (quoting *Howard v. Oakwood Homes Corp.*, 134 N.C. App. 116, 118, 516 S.E.2d 879, 881, *disc. review denied*, 350 N.C. 832, 539 S.E.2d 288 (1999), *cert. denied*, 528 U.S. 1155, 145 L. Ed. 2d 1072 (2000)) (alteration in original). Accordingly, we will address the merits of defendants' instant appeal.

Determination of whether a dispute is subject to arbitration involves a two-pronged analysis. *Sloan Fin. Grp., Inc. v. Beckett*, 159 N.C. App. 470, 478, 583 S.E.2d 325, 330 (2003), *aff'd per curiam*, 358 N.C. 146, 593 S.E.2d 583 (2004). The trial court must determine whether the specific dispute is covered by the " 'substantive scope of th[e] agreement[,]' " and whether " 'the parties had a valid agreement to arbitrate[.]' " *Id.* (quoting *Raspet*, 147 N.C. App. at 136, 554 S.E.2d at 678 (citation and quotation marks omitted)). "The obligation and entitlement to arbitrate 'does not attach only to one who has personally signed the written arbitration provision.' Rather, '[w]ell-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties.' " *Washington Square Securities, Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004) (quoting *Inter. Paper v. Schwabedissen Maschinen & Anlagen*, 206 F.3d 411, 416-17 (4th Cir. 2000)) (alteration in original).

In the instant case, Angela and Rebecca signed the contracts between ACCU and AC Schultes only in their capacity as officers of

ACCU. Nevertheless, defendants assert that the doctrine of equitable estoppel requires plaintiffs to arbitrate the issues of their individual complaint against defendants. "Equitable estoppel precludes a party from asserting rights 'he otherwise would have had against another' when his own conduct renders assertion of those rights contrary to equity." *Schwabedissen*, 206 F.3d at 417-18 (quoting *First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enterprises, Inc.)*, 81 F.3d 1310, 1317 (4th Cir. 1996)).

> In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. "To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act."

*Schwabedissen*, 206 F.3d at 418 (quoting *Avila Group, Inc. v. Norma J. of California*, 426 F. Supp. 537, 542 (S.D.N.Y. 1977)) (alteration in original).

In *Schwabedissen*, the Fourth Circuit Court of Appeals noted that "[a] nonsignatory is estopped from refusing to comply with an arbitration clause 'when it [is seeking or] receives a "direct benefit" from a contract containing an arbitration clause.'" 206 F.3d at 418 (citations omitted). In that case, International Paper agreed to buy an industrial saw from Wood Systems, who in turn engaged Schwabedissen to build the saw according to specifications set forth in a contract. After the saw delivered to International Paper failed to work properly, International Paper filed suit against Schwabedissen, alleging breach of contract and breach of warranties based upon the Wood Systems-Schwabedissen contract. On appeal of the trial court order enforcing an arbitration award, International Paper argued that it was not bound to arbitrate its claim against Schwabedissen because it was not a signatory to the contract between Wood Systems and Schwabedissen. The Fourth Circuit Court of Appeals disagreed, holding that because International Paper was seeking to gain a direct benefit from the provisions of the Wood Systems-Schwabedissen contract, it was estopped from avoiding the contract provisions requiring arbitration of its claims. *Id.* The Court explained its reasoning as follows:

> The Wood-Schwabedissen contract provides part of the factual foundation for every claim asserted by International Paper against Schwabedissen. . . . International Paper alleges that Schwabedissen failed to honor the warranties in the Wood-Schwabedissen contract and it seeks damages, revocation, and rejection "in accordance with" that contract. International Paper's entire case hinges on its asserted rights under the Wood-Schwabedissen contract; it cannot seek to enforce those contractual rights and avoid the contract's [arbitration] requirement . . . .

*Id.*

In the instant case, defendants cite *Schwabedissen* in support of their argument that plaintiffs are estopped from refusing to arbitrate their claims. However, although we note that the contract between ACCU and AC Schultes "provides part of the factual foundation" for plaintiffs' complaint, we also note that in *Schwabedissen*, International Paper's "entire case hinge[d] on its asserted rights under the Wood-Schwabedissen contract[.]" *Id.* In the instant case, plaintiffs are not seeking any direct benefits from the contracts containing the relevant arbitration clause, nor are they asserting any rights arising under the ACCU-AC Schultes contracts. Neither plaintiffs' allegations of unfair and deceptive trade practices nor plaintiffs' allegations of tortious interference depend upon the contracts containing the arbitration clause. Both of the claims are dependent upon legal duties imposed by North Carolina statutory or common law rather than contract law. *See United Virginia Bank v. Air-Lift Associates*, 79 N.C. App. 315, 320, 339 S.E.2d 90, 93 (1986) ("[A]n action for unfair and deceptive trade practices is a distinct action separate from fraud, breach of contract, and breach of warranty."); *Coleman v. Whisnant*, 225 N.C. 494, 506, 35 S.E.2d 647, 656 (1945) ("We think the general rule prevails that unlawful interference with the freedom of contract is actionable, whether it consists in maliciously procuring breach of a contract, or in preventing the making of a contract when this is done, not in the legitimate exercise of the defendant's own right, but with design to injure the plaintiffs, or gaining some advantage at his expense."). Thus, defendants' liability will be determined by its duties under North Carolina statutory and common law, not by its duties under the contracts between ACCU and AC Schultes. Unlike in *Schwabedissen*, plaintiffs' "entire case" does not "hinge[] on [any] asserted rights under the . . . contract." 206 F.3d at 418. Therefore, because plaintiffs are not seeking a direct benefit from the provisions of the ACCU-AC Schultes contracts, we conclude that the doctrine of

LEANDRO v. STATE OF NORTH CAROLINA

[122 N.C. App. 1 (1996)]

equitable estoppel cannot be used to force plaintiffs to arbitrate their individual claims. Accordingly, we hold that the trial court did not err in denying defendants' motions to compel arbitration.

Affirmed.

Judges McCULLOUGH and STEELMAN concur.