733 S.E.2d 597

**William F. PEARSON, M.D., Respondent,**

**v.**

**HILTON HEAD HOSPITAL a/k/a Hilton Head Health System, L.P., Tenet Healthsystem Medical, Inc., Tenet Physician Services–Hilton Head, Inc. and LocumTenens.com, LLC, Defendants,**

**Of whom Hilton Head Hospital a/k/a Hilton Head Health System, L.P., Tenet Healthsystem Medical, Inc., Appellants.**

**No. 5036.**

Court of Appeals of South Carolina.

Heard May 9, 2012.

Decided Oct. 3, 2012.

C. Mitchell Brown and Sue Erwin Harper, both of Columbia, for Appellants.

Anne Louise Peterson–Hutto, of Charleston, for Respondent.

KONDUROS, J.

Hilton Head Hospital a/k/a Hilton Head Health System, L.P.; Tenet HealthSystem Medical, Inc.; and Tenet Physician Services–Hilton Head, Inc. (collectively the Hospital) appeal the circuit court's denial of its motion to compel arbitration against Dr. William F. Pearson. It contends because the circuit court granted a co-defendant's motion to compel, the court also should have granted the Hospital's motion because the claims are intertwined and based upon the same facts. It further argues because Dr. Pearson has received the benefit of the contract between it and the co-defendant, which contains an arbitration clause, and because it received a benefit under Dr. Pearson and the co-defendant's contract, which also contained an arbitration clause, he should be forced to arbitrate with it when his causes of action against the Hospital included breach of contract. We reverse.

## FACTS/PROCEDURAL HISTORY

LocumTenens.com, LLC (Locum) is an online medical professional placement corporation, headquartered in Georgia, that recruits medical professionals online and through electronic mail and places them throughout the United States, particularly in South Carolina. The Hospital and Locum entered into a contract in 2006 in which Locum would place temporary physicians at the Hospital to work as independent contractors. In 2007, Locum entered into a contract with Dr.

Pearson to place him at the Hospital as an anesthesiologist for forty days in July, August, and September of 2007.

The contract between the Hospital and Locum provided, "Any controversy or claim arising out of or relating to the interpretation, enforcement or breach of this Agreement or the relationship between the parties hereto shall be resolved by binding arbitration in accordance with the Commercial Arbitration Rules for the American Arbitration Association . . . ." The contract between Dr. Pearson and Locum contained the same clause.

On August 27, 2007, Dr. Pearson was the anesthesiologist on call at the Hospital when complications occurred in a delivery of twins. The Hospital and Locums fired Dr. Pearson on August 28, 2007. Dr. Pearson filed a complaint on August 28, 2009, against the Hospital and Locum requesting relief under the South Carolina Payment of Wages Act and alleging retaliatory discharge, defamation, and breach of contract. On October 22, 2009, the Hospital filed a motion to compel arbitration. On December 8, 2009, Locum also filed a motion to compel arbitration. The circuit court granted Locum's motion to compel arbitration but denied the Hospital's motion to compel arbitration. The court stated the contract between Locum and the Hospital was a general one, not specific to Dr. Pearson and predated the contract between Locum and Dr. Pearson. It found Dr. Pearson did not sign an agreement with the Hospital to arbitrate any claims arising out of their relationship. The court found the case of *International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411 (4th Cir.2000), unpersuasive as it involved only one contract. This appeal followed.

## STANDARD OF REVIEW

■■ Unless the parties otherwise provide, the question of the arbitrability of a claim is an issue for judicial determination. *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 596, 553 S.E.2d 110, 118 (2001). Determinations of arbitrability are subject to de novo review, but if any evidence reasonably supports the circuit court's factual findings, this court will not overrule those findings. *Stokes v. Metro. Life Ins. Co.*, 351 S.C. 606, 609–10, 571 S.E.2d 711, 713 (Ct.App.2002).

## LAW/ANALYSIS

■ The Hospital contends the circuit court erred in denying its motion to compel arbitration because (1) Dr. Pearson's claims fall within the arbitration agreement he signed with Locum; (2) federal law recognizes the right to compel non-signatories to arbitrate and for non-signatories to compel signatories to arbitrate; (3) Dr. Pearson is relying on the terms in the agreement between Locum and the Hospital and Dr. Pearson sought to benefit from it; and (4) the Hospital is a third-party beneficiary to Dr. Pearson and Locum's contract. We agree.

■ "To decide whether an arbitration agreement encompasses a dispute, a court must determine whether the factual allegations underlying the claim are within the scope of the broad arbitration clause, regardless of the label assigned to the claim." *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 597, 553 S.E.2d 110, 118 (2001). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* However, "[a]rbitration rests on the agreement of the parties.... A party cannot be compelled to arbitrate a particular dispute unless his agreement expressly encompasses the subject matter of the dispute." *Simmons v. Lucas & Stubbs Assocs.*, 283 S.C. 326, 332–33, 322 S.E.2d 467, 470 (Ct.App.1984). However, "unless the court can say with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the dispute, arbitration should be ordered." *Zabinski*, 346 S.C. at 597, 553 S.E.2d at 118. "A motion to compel arbitration made pursuant to an arbitration clause in a written contract should only be denied where the clause is not susceptible to any interpretation which would cover the asserted dispute." *Id.* at 597, 553 S.E.2d at 118–19.

■ "Unless the parties have contracted to the contrary, the [Federal Arbitration Act (FAA)] applies in federal or state court to any arbitration agreement regarding a transaction that in fact involves interstate commerce, regardless of whether or not the parties contemplated an interstate transaction." *Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 538, 542 S.E.2d 360, 363 (2001) (footnote omitted). "The United States Supreme Court has held that the phrase 'involving commerce' is the same as 'affecting commerce,' which has been broadly

interpreted to mean Congress intended to utilize its powers to regulate interstate commerce to its full extent." *Blanton v. Stathos,* 351 S.C. 534, 540, 570 S.E.2d 565, 568 (Ct.App.2002) (citing *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)). "To ascertain whether a transaction involves commerce within the meaning of the FAA, the court must examine the agreement, the complaint, and the surrounding facts." *Zabinski,* 346 S.C. at 594, 553 S.E.2d at 117.

"Generally, arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 416 (4th Cir.2000) (citation and internal quotation marks omitted). "While a contract cannot bind parties to arbitrate disputes they have not agreed to arbitrate, '[i]t does not follow ... that under the [Federal Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision.'" *Id.* (quoting *Fisser v. Int'l Bank,* 282 F.2d 231, 233 (2d Cir.1960)) (alterations by court). "Rather, a party can agree to submit to arbitration by means other than personally signing a contract containing an arbitration clause." *Id.* South Carolina has recognized "a party should not be allowed to avoid an arbitration agreement by naming nonsignatory parties in his complaint ... because this would nullify the rule requiring arbitration." *S.C. Pub. Serv. Auth. v. Great W. Coal (Ky.), Inc.,* 312 S.C. 559, 563, 437 S.E.2d 22, 24 (1993) (citing *Arnold v. Arnold Corp.,* 920 F.2d 1269 (6th Cir.1990)). The rule in the Fourth Circuit is that "a broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when a 'significant relationship' exists between the asserted claims and the contract in which the arbitration clause is contained." *Long v. Silver,* 248 F.3d 309, 316 (4th Cir.2001).

"Well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Int'l Paper Co.,* 206 F.3d at 416–17. A parent company has been forced to arbitrate even though not a party to the agreement when the subsidiary was a party to

the agreement under a theory of equitable estoppel. *Id.* at 417 (quoting *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320–21 (4th Cir.1988)) (citing *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757 (11th Cir.1993) (holding that because claims against nonsignatory parent were "intimately founded in and intertwined with" a contract containing an arbitration clause, signatory was estopped from refusing to arbitrate those claims); *Hughes Masonry Co. v. Greater Clark Cnty. Sch. Bldg. Corp.,* 659 F.2d 836, 840–41 (7th Cir.1981) (finding signatory equitably estopped from repudiating arbitration clause in agreement on which suit against nonsignatory was based)). "Moreover, the Second Circuit recently noted that it had recognized that five theories 'aris[ing] out of common law principles of contract and agency law' could provide a basis 'for binding nonsignatories to arbitration agreements: 1) incorporation by references; 2) assumption; 3) agency; 4) veil piercing/alter ego; and 5) estoppel.' " *Id.* (citing *Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995); *Bel–Ray Co. v. Chemrite (Pty) Ltd.,* 181 F.3d 435, 440–43 (3d Cir.1999); *Amoco Transport Co. v. Bugsier Reederei & Bergungs, A.G. (In re Oil Spill by the "Amoco Cadiz"),* 659 F.2d 789, 795–96 (7th Cir.1981)) (alteration by court).

"[S]tate law determines questions 'concerning the validity, revocability, or enforceability of contracts generally,' ... but the Federal Arbitration Act, 9 U.S.C. § 2 (1994), and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, enforced by 9 U.S.C. §§ 201–08 (1994), 'create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.' " *Id.* at 417 n. 4 (quoting *Perry v. Thomas,* 482 U.S. 483, 493 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). "These statutes constitute a congressional declaration of liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Id.* (citation and quotation marks omitted). Because the determination of whether a nonsignatory is bound by a contract presents no state law question of contract formation or validity, the court

looks to the federal substantive law of arbitrability to resolve the question. *Id.*

"Equitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." *Id.* at 417–18 (citation and quotation marks omitted).

> In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause *when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.*

*Id.* at 418 (emphasis added). " 'To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.' " *Id.* (quoting *Avila Grp., Inc. v. Norma J. of Cal.,* 426 F.Supp. 537, 542 (S.D.N.Y.1977)) (alteration by court).

"A nonsignatory is estopped from refusing to comply with an arbitration clause 'when it receives a direct benefit from a contract containing an arbitration clause.' " *Id.* (quoting *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir.1999)) (citing *Deloitte Noraudit A/S v. Deloitte Haskins & Sells,* 9 F.3d 1060, 1064 (2d Cir.1993) (holding nonsignatory bound to arbitrate when it knew of the arbitration agreement and "knowingly accepted the benefits of" that agreement)) (comparing *Hughes Masonry Co.,* 659 F.2d at 838–39 ("[I]t would be manifestly inequitable to permit Hughes to both claim that J.A. [a nonsignatory] is liable to Hughes for its failure to perform the contractual duties described in the [arbitration agreement] and at the same time deny that J.A. is a party to that agreement in order to avoid arbitration of claims clearly within the ambit of the arbitration clause.") (alterations by court)).

> Some courts have, at a nonsignatory's instance, required a signatory of an arbitration agreement to arbitrate with the nonsignatory because of "the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract ... and [the fact that] the claims were intimately

founded in and intertwined with the underlying contract obligations."

*Id.* at 418 n. 6 (quoting *Sunkist,* 10 F.3d at 757) (alterations by court). The *International Paper Co.* court recognized that the Second Circuit has held that "a 'close relationship' and 'intimate [ ]' factual connection provide no independent basis to require a nonsignatory of an arbitration agreement to arbitrate with a signatory, and therefore that a nonsignatory cannot be bound without receiving a 'direct benefit' from or pursuing a 'claim . . . integrally related to the contract containing the arbitration clause.'" *Id.* (quoting *Thomson–CSF,* 64 F.3d at 778–80) (alterations by court). The court determined it did not need to reach that question "because International Paper clearly does seek a 'direct benefit' from the Wood–Schwabedissen agreement and makes a 'claim . . . integrally related to' that contract." *Id.* (alteration by court).

*In Jackson v. Iris.com,* the court summarized *International Paper Co.*:

> International Paper bought an industrial saw from Wood Systems, a distributor. The saw was manufactured by Schwabedissen pursuant to a contract between Wood Systems and Schwabedissen containing an arbitration clause. International Paper was not a signatory to the contract. The industrial saw was defective, and International Paper sued Schwabedissen for breach of the terms and warranties of the contract. The Fourth Circuit found that International Paper was equitably estopped from denying the applicability of the arbitration clause to its claims against Schwabedissen because International Paper could not both accept the contract's benefits (the warranty provisions) and, at the same time, reject the contract's burdens (the arbitration provisions).

524 F.Supp.2d 742, 750 (E.D.Va.2007) (citing *Int'l Paper Co.,* 206 F.3d at 414, 416–19).

"Generally, these cases involve non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 200 (3d Cir.2001) (citing

*Tencara Shipyard,* 170 F.3d at 353 (finding non-signatory derived benefit from contract and could not avoid the arbitration clause contained therein)). The Third Circuit has noted:

many of these cases resemble the third party beneficiary cases. In *Tencara Shipyard,* for example, the non-signatory was the intended third party beneficiary of the contract containing the arbitration clause. The two theories of liability are, however, distinct. Under the third party beneficiary theory, a court must look to the intentions of the parties at the time the contract was executed. Under the equitable estoppel theory, a court looks to the parties' conduct after the contract was executed. Thus, the snapshot this Court examines under equitable estoppel is much later in time than the snapshot for third party beneficiary analysis.

*Id.* at 200 n. 7.

In *E.I. DuPont de Nemours & Co.,* the court was troubled that a close examination of the Amended Complaint reveals that, at bottom, DuPont's claims against the subsidiary, Rhodia Fiber, arise, at least in part, from the underlying Agreement. Parenthetically, it is difficult to decipher exactly what DuPont claims *each* appellant has done giving rise to liability because in its Amended Complaint DuPont lumps them together as "the Rhodia Group," just as in the Complaint, it lumped them together as "RP."

*Id.* at 200–01. The court further noted:

The Amended Complaint does not allege only that Rhodia, the parent, breached its oral agreement to provide loan guarantees to its subsidiary. If this were DuPont's only claim in this case, the Amended Complaint would have named one, and only one, defendant-Rhodia. Instead, the Amended Complaint also named Rhodia Fiber, the subsidiary, as a defendant because, DuPont alleges, Rhodia Fiber breached its oral promise to DuPont that it would continue to abide by its obligations in the Agreement, *i.e.,* securing loan guarantees for the joint venture. To the extent that DuPont presses a claim against Rhodia Fiber for breaching its oral commitment to perform under the Agreement, DuPont alleges a claim which can well be argued (a) embraces the underlying Agreement and (b) requires proof that Rhodia Fiber ultimately breached the underlying Agreement.

The question, then, is whether having alleged that it entered into a separate oral agreement with Rhodia Fiber binding Rhodia Fiber to the very obligations it undertook in the Agreement, DuPont is now equitably estopped from avoiding another provision of the Agreement, *i.e.,* the arbitration clause. This is a close call.

On the one hand, we must be careful about disregarding the corporate form and treating a non-signatory like a signatory. On the other hand, by alleging, albeit by virtue of a separate oral agreement, that Rhodia Fiber failed to secure loan guarantees, DuPont's claim against Rhodia Fiber implicates, at least in part, the very Agreement which DuPont repudiates to avoid arbitration. It is, however, that separate oral agreement that saves the day for DuPont because, wholly apart from whether Rhodia Fiber breached the Agreement, what is at the core of this case is the conduct and the statements of appellants' representative in January of 1998.

With reference to the second theory of equitable estoppel, appellants rely on a series of cases in which signatories were held to arbitrate related claims against parent companies who were not signatories to the arbitration clause. In each of these cases, a signatory was bound to arbitrate claims brought by a non-signatory because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract and the fact that the claims were intertwined with the underlying contractual obligations. . . . Appellants recognize that these cases bind a *signatory* not a *non-signatory* to arbitration, but argue that this is a distinction without a difference. They are wrong.

*Id.* at 201–02.

The court noted that the Second Circuit had rejected the "distinction without a difference" argument:

"As these cases indicate, the circuits have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed. As the district court pointed out, however, '[t]he situation here is inverse: E & S, as

signatory, seeks to compel Thomson, a non-signatory.' While E & S suggests that this is a non-distinction, the nature of arbitration makes it important. Arbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so. In the line of cases discussed above, the courts held that the parties were estopped from avoiding arbitration because they had entered into written arbitration agreements, albeit with the affiliates of those parties asserting the arbitration and not the parties themselves. Thomson, however, cannot be estopped from denying the existence of an arbitration clause to which it is a signatory because no such clause exists. At no point did Thomson indicate a willingness to arbitrate with E & S. Therefore, the district court properly determined these estoppel cases to be inapposite and insufficient justification for binding Thomson to an agreement that it never signed."

*Id.* at 202 (quoting *Thomson–CSF, S.A.,* 64 F.3d at 779) (alteration by court). The court found "[t]he distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged." *Id.* A non-signatory cannot be "required to arbitrate unless its conduct falls within one of the accepted principles of agency or contract law that permit doing so." *Id.* "In sum, the thrust of the claims in the Amended Complaint are far enough removed from the Agreement such that DuPont should not be equitably estopped from repudiating the arbitration clause contained in the Agreement." *Id.*

In *Ellen v. A.C. Schultes of Maryland, Inc.,* 172 N.C.App. 317, 615 S.E.2d 729, 733 (2005), the court found

plaintiffs are not seeking any direct benefits from the contracts containing the relevant arbitration clause, nor are they asserting any rights arising under the ACCU–AC Schultes contracts. Neither plaintiffs' allegations of unfair and deceptive trade practices nor plaintiffs' allegations of tortious interference depend upon the contracts containing the arbitration clause. Both of the claims are dependent upon legal duties imposed by North Carolina statutory or common law rather than contract law.

The court determined "because plaintiffs are not seeking a direct benefit from the provisions of the ACCU–AC Schultes contracts, we conclude that the doctrine of equitable estoppel cannot be used to force plaintiffs to arbitrate their individual claims[, and] the trial court did not err in denying defendants' motions to compel arbitration." *Id.*

A South Carolina district court has noted the Eleventh Circuit's position on the ways nonsignatories could compel arbitration against signatories:

> Existing case law demonstrates that equitable estoppel allows a non-signatory to compel arbitration in two different circumstances. *First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory.* When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. *Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.* Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.

*Goer v. Jasco Indus., Inc.*, 395 F.Supp.2d 308, 314 n. 9 (D.S.C.2005) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.1999)) (emphases added by court).

 "[A] party may not 'rely on the contract when it works to its advantage, and repudiate it when it works to its disadvantage.' " *Jackson*, 524 F.Supp.2d at 749 (quoting *Hughes Masonry Co.*, 659 F.2d at 839). When "a signatory seeks to enforce an arbitration agreement against a non-signatory, the doctrine estops the non-signatory from claiming that he is not bound to the arbitration agreement when he receives a 'direct benefit' from a contract containing an arbitration clause." *Id.* at 749–50 (citing *Int'l Paper Co.*, 206 F.3d at 417–18; *Am. Bankers Ins. Group v. Long*, 453 F.3d 623,

628 (4th Cir.2006); *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n,* 384 F.3d 157, 162 (4th Cir.2004); *Tencara Shipyard S.P.A.,* 170 F.3d at 353 (holding non-signatory was estopped from denying applicability of arbitration clause when nonsignatory received "direct benefits" from contract including lowered insurance rates and the ability to sail under the French flag)).

In *Jackson,* the court found:

> Jackson seeks to have his cake and eat it too. Iris paid G*Town $550,000 pursuant to the G*Town Contract. No other sums were paid by Iris. G*Town then paid $450,000 to ATA, Jackson's undisputed agent. ATA then paid $150,000 to Jackson and $75,000 to Elliot. Jackson concedes that he retained the $150,000 payment. The $150,000 ultimately retained by Jackson was a "direct benefit" of the G*Town Contract executed by Iris and G*town. Pursuant to the test outlined by the Fourth Circuit, Jackson is therefore equitably estopped from denying the applicability of the arbitration clause, even though, allegedly, neither he nor his agents signed the G*Town Contract. Iris' $150,000 payment to Jackson, albeit indirect, was intended to be partial consideration for his performance in Africa pursuant to the G*Town Contract. It would be inequitable to permit Jackson to retain the direct benefits of the G*Town Contract (the $150,000 paid by Iris) while, at the same time, permitting him to deny the contract's burdens (the arbitration provision).

*Id.* at 750 (citations and footnote omitted).

The Hospital argues that Dr. Pearson is bound by the arbitration clause both as a nonsignatory to the Hospital and Locum's agreement and as a signatory to his and Locum's agreement. Although some courts have been more inclined to compel arbitration when the person or entity to be compelled was a signatory because they actually consented to arbitration, the Fourth Circuit has recognized the right to compel a nonsignatory.

Here, looking at Dr. Pearson as a nonsignatory in the contract between Locum and the Hospital, he received a benefit due to the contract, in that he was able to work at the Hospital and receive payment for his work. If not for that

contract, then Dr. Pearson would have had to make separate arrangements with the Hospital in order to work there. He knowingly accepted benefits of the contract between the Hospital and Locum. Accordingly, Dr. Pearson benefitted from that contract and should not be able to disclaim the arbitration agreement contained in it.

Additionally, looking at the Hospital as a nonsignatory in the contract between Dr. Pearson and Locum, Dr. Pearson has to rely on his contract or the Hospital's to have a breach of contract action against the Hospital. Because both of those contracts have arbitration clauses, he should not be allowed to hold the Hospital to one of the contracts to allege a breach but not be subject to the arbitration provisions. Dr. Pearson's contract stated that the Hospital was the client.

Further, in Dr. Pearson's complaint, he makes no distinction between the Hospital and Locum. He lumps them together as defendants and states they are jointly and severally liable. Additionally, the lawsuit arose against Locum and the Hospital from the same set of facts. Further, he raises a cause of action for breach of contract against the defendants, not just Locum. Accordingly, he is seeking either to receive damages under Locum and the Hospital's contract, or to hold the Hospital accountable under his and Locum's contract. Therefore, he is either seeking a benefit under the Hospital's contract or attempting to hold the Hospital accountable under his.

Lastly, the contract between Locum and Dr. Pearson further states that "[a]ny controversy or claim arising out of or relating to the interpretation, enforcement or breach of this Agreement . . . shall be resolved by binding arbitration." The causes of action against the Hospital arose as a result of Dr. Pearson's being placed there by Locum, which was the purpose of the contract. Based on all the forgoing, the circuit court's denial of the Hospital's motion to compel arbitration is

**REVERSED.**

PIEPER and GEATHERS, JJ., concur.