# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Stephanie Walker Weaver, Respondent,

v.

Brookdale Senior Living, Inc., HBP LeaseCo, LLC d/b/a
Brookdale Charleston, Terri Robinson, John Does and
Richard Roe Corporations, Defendants,

Of whom Brookdale Senior Living, Inc., HBP LeaseCo,
LLC d/b/a Brookdale Charleston, and Terri Robinson are
the Appellants.

Appellate Case No. 2017-002241

_____

Appeal From Charleston County
J. C. Nicholson, Jr., Circuit Court Judge

_____

Opinion No. 5752
Submitted May 8, 2020 – Filed July 29, 2020

_____

**AFFIRMED**

_____

Robert Gerald Chambers, Jr. and Carmelo Barone
Sammataro, both of Turner Padget Graham & Laney, PA,
of Columbia; and Kimberly A. Ashmore and Richard
Albert Simpson, both of Wiley Rein, LLP, of
Washington, DC, all for Appellants.

Kenneth Luke Connor and Christopher Caleb Connor,
both of Connor & Connor LLC, of Aiken; and Eliza
Hutto Cantwell and Joshua P. Cantwell, both of Cantwell
Law Firm, LLC, of Charleston, all for Respondent.

**HILL, J.:**   Bonnie S. Walker moved into Brookdale Charleston, a residential care facility, in early June 2016.  One evening six weeks later, Walker wandered out of the facility.  Brookdale did not realize she was missing from their care until around seven the next morning, whereupon they notified Walker's family of her disappearance.  When Stephanie Walker Weaver, Walker's granddaughter, and other family members arrived, they embarked upon a search of Brookdale's grounds.  Weaver's efforts led her to a retention pond, where she discovered her grandmother's body, which had been maimed and dismembered by an alligator.

Weaver brought this lawsuit in her personal capacity against Brookdale, its parent companies, and its administrator Terri Robinson (collectively Appellants) for negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress.  Appellants moved to dismiss Weaver's complaint on numerous grounds and also moved to compel Weaver to arbitration based on the arbitration provision in the residency agreement between her grandmother and Brookdale.  The trial court denied Appellants' motions.  Because we conclude Weaver is not bound by the arbitration provision, we affirm the denial of the motion to compel arbitration.

I.

Whether an arbitration agreement may be enforced against a nonsignatory is a question of law we review de novo, but we will not disturb the trial court's underlying factual findings reasonably supported by the record. *Wilson v. Willis*, 426 S.C. 326, 335, 827 S.E.2d 167, 172 (2019).  To compel Weaver to arbitrate her claims, Appellants must demonstrate (1) there is a valid arbitration agreement, and (2) the claims fall within its scope. *Id*. at 336, 827 S.E.2d at 173.  This appeal turns on the first inquiry: whether Weaver and Appellants are bound by a valid arbitration agreement.

It is undisputed the residency agreement between Walker and Brookdale contained an arbitration provision subject to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (2018) (FAA).  Weaver was not a party to the agreement, nor is there any evidence she was aware of it.  The arbitration provision purports that it "binds third parties not signatories to this Arbitration provision" including "family members, or other persons claiming through the Resident, or persons claiming through the Resident's estate, whether such third parties make a claim in a representative capacity or in a personal capacity."

Appellants contend the trial court erred in denying their motion to compel arbitration because it overlooked the strong federal and state policy favoring arbitration. They contend that although Weaver did not sign the agreement, she is equitably bound by it due to the services her grandmother received and because the duties and standard of care Weaver frames her lawsuit upon are defined by the agreement.

A. The FAA

There is a potent public policy favoring arbitration, but this policy is deployed only as an aid in interpreting the scope and enforcement of validly entered arbitration agreements. *See, e.g.*, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ."). The policy does not kick in until the court determines a valid agreement to arbitrate exists. The FAA was Congress' response to the reluctance of courts to enforce arbitration agreements between commercial merchants trading in interstate commerce. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018); *see also id.* at 1643 n.10 (Ginsburg, J., dissenting). The FAA commands such arbitration agreements be treated the same as all other contracts—no more, no less. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967) ("[T]he purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so."). The FAA therefore places arbitration contracts on equal footing with other contracts, but it does not, as Appellants suggest, give the party seeking arbitration a leg up in the threshold determination of whether a valid arbitration agreement exists. The FAA ensures the even-handed enforcement of arbitration agreements implicating interstate commerce—that is, contracts where the parties have consciously chosen to resolve their disputes by private arbitration rather than the public justice system. *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) (FAA "establishes an equal-treatment principle" prohibiting state laws from discriminating against arbitration contracts). This choice, like any contract term, must be mutually agreed upon, for "the FAA does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). This is the keystone of the FAA: as the Supreme Court recently reemphasized, "the first principle that underscores all of our arbitration decisions is that [a]rbitration is strictly a matter of consent." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) (quotation marks omitted) (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010)).

Accordingly, "[a]lthough arbitration is viewed favorably by the courts, it is predicated on an agreement to arbitrate because parties are waiving their fundamental right to access to the courts." *Wilson*, 426 S.C. at 337, 827 S.E.2d at 173. "[T]he presumption in favor of arbitration applies to the scope of an arbitration agreement; it does not apply to the existence of such an agreement *or to the identity of the parties who may be bound* to such an agreement." *Id.* (internal quotation omitted). In fact, if the party resisting arbitration is a nonsignatory, a presumption against arbitration arises. *Id*. at 337–38, 827 S.E.2d at 173.

    B. <u>Binding nonsignatories to arbitration agreements</u>

State law controls when an arbitration agreement may be enforced against someone who has not signed it. *Id.* at 338, 827 S.E.2d at 173–74; *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009). South Carolina law recognizes several theories whereby a nonsignatory can be bound by an arbitration agreement. *Malloy v. Thompson*, 409 S.C. 557, 561–62, 762 S.E.2d 690, 692 (2014) (listing theories as incorporation by reference, assumption, agency, veil piercing/alter ego, and estoppel). Appellants rely on just one: equitable estoppel. This theory, known also as direct benefits estoppel in the arbitration realm, estops a nonsigner from refusing to comply with an arbitration provision of a contract if (1) the nonsigner's claim arises from the contractual relationship, (2) the nonsigner has "exploited" other parts of the contract by reaping its benefits, and (3) the claim relies solely on the contract terms to impose liability. *Wilson*, 426 S.C. at 340–44, 827 S.E.2d at 175–77.

Appellants insist direct benefits estoppel funnels Weaver's claims to arbitration because her ability to sue Appellants stems from Walker's residency agreement, which includes the arbitration provision. This argument is easily scotched, for "direct benefits estoppel is not implicated simply because a claim relates to or would not have arisen 'but for' a contract's existence." *Id*. at 343, 827 S.E.2d at 176. Yet Appellants go further and assert Weaver's claims are not only related to Walker's residency agreement but rely upon and are limited by its terms. Citing *Flinn v. Crittenden*, 287 S.C. 427, 339 S.E.2d 138 (Ct. App. 1985), they contend the scope of a nursing home's duty of care is a matter of contract. *Flinn* was a negligence case, and the issue there was whether the nursing home breached its duty of care to decedent's husband because it "failed to constantly attend his wife while she was a patient." *Id*. at 428, 339 S.E.2d at 138. This court affirmed summary judgment to the nursing home, finding husband had signed an admission agreement on behalf of his wife that limited the scope of the nursing home's care to general duty—rather than continuous or special duty—nursing care.

Unlike the husband in *Flinn*, Weaver did not sign the residency agreement. And *Flinn* did not hold nursing home contracts supplant common law duties imposed by the law of ordinary negligence; it is better viewed as holding the contractual duty was commensurate with those duties, and husband's claim failed because there was no evidence the nursing home had breached the duty of reasonable care, nor had they agreed to assume duties beyond those required by negligence law. After all, the court emphasized nursing homes were not insurers of patient safety. The net effect of Appellants' interpretation of *Flinn* would be that something akin to the economic loss rule governs claims against nursing homes involving residency agreements, limiting recovery to contract losses and barring tort recovery altogether. *See Sapp v. Ford Motor Co.*, 386 S.C. 143, 147, 687 S.E.2d 47, 49 (2009) (discussing economic loss rule). We have never accepted the economic loss rule in cases involving personal injuries and do not believe it now arrives as a stowaway aboard *Flinn*. *See id.*

Appellants' equitable estoppel argument is better analyzed against the backdrop of *Malloy*, which involved claims by Malloy against Thompson and his employer, Merrill Lynch, alleging they had interfered with an inheritance Malloy expected from decedent. According to Malloy, Thompson and Merrill Lynch disrupted decedent's estate plan and diverted his assets to themselves. Merrill Lynch moved to compel Malloy to arbitrate his claims, maintaining any duty it owed derived from its client relationship agreement (CRA) with decedent, even though Malloy was not a party to the CRA. Rejecting this argument, our supreme court explained:

> Merrill Lynch's argument that a derivative "duty" from the CRAs binds Malloy, a non-signatory to the CRAs, conflates the duties created by the CRA contracts and general tort duties. Malloy does not claim that Merrill Lynch breached a duty created by the CRAs, but rather that it breached the duty owed by all persons not to intentionally interfere with another's expected inheritance. The contractual duties between Decedent and Merrill Lynch are irrelevant to whether Merrill Lynch intentionally interfered with Malloy's expected inheritance.

*Malloy*, 409 S.C. at 562, 762 S.E.2d at 692–93.

Likewise, here Weaver's claims rely on general tort duties owed by Appellants to everyone, not any provision of the residency agreement. For instance, one of her

emotional distress claims alleges she was injured because Appellants mishandled and failed to safeguard Walker's remains. Our review of the residency agreement reveals no provision regarding the handling of a deceased resident's remains (although it did grant Walker the right to terminate the agreement if she gave "written notice in the event of your death"). Weaver's claims arise from the duties that arose when Appellants failed to locate Walker; called Walker's family, including Weaver, to notify them of Walker's disappearance; enlisted Weaver's help in searching for Walker; and failed to warn her of the danger of the alligator pond that Appellants knew or should have known about when Weaver began searching for Walker. These duties do not flow directly from the residency agreement. *See Wilson*, 426 S.C. at 343, 827 S.E.2d at 176 (explaining a benefit is direct if it "flows directly from the agreement," but it is indirect where the nonsignatory's claim relates to "the contractual relationship of the parties, but does not exploit (and thereby assume) the agreement itself").

Weaver has not "exploited" or otherwise sought to enforce or benefit from the residency agreement, any more than a pedestrian run over by a truck has benefited from the contract for the purchase of the truck. We have addressed this argument before in the nursing home context. *See Hodge v. UniHealth Post-Acute Care of Bamberg, LLC*, 422 S.C. 544, 563, 813 S.E.2d 292, 302 (Ct. App. 2018) (declining to apply equitable estoppel against Respondent nonsignatories to arbitration agreement between nursing home and decedent, Mable: "The only agreement from which Respondents even arguably received a benefit was the Admission Agreement because Mable was admitted to the Facility as a result of it. However, because the Facility allegedly caused Mable's injuries that later led to her death, we find it difficult to find she benefited even from being admitted. Respondents are not seeking to enforce the Arbitration Agreement nor have they previously tried to do so"). Like the nonsignatories in *Wilson*, Weaver has not "attempted to procure any direct benefit" from the residency agreement "while attempting to avoid its arbitration provision." 426 S.C. at 345, 827 S.E.2d at 177; *cf. Pearson v. Hilton Head Hosp.*, 400 S.C. 281, 296–97, 733 S.E.2d 597, 605 (Ct. App. 2012) (applying direct benefits estoppel to bind nonsignatory doctor to arbitration provision in hospital's contract with another entity because doctor directly benefited from contract by being able to work at the hospital and receive payments under the contract).

Equitable estoppel is "a theory designed to prevent injustice, and it should be used sparingly." *Wilson*, 426 S.C. at 345, 827 S.E.2d at 177. Born of equity, the heart of the theory "is that the party entitled to invoke the principle was misled to his injury." *Rodarte v. Univ. of S.C.*, 419 S.C. 592, 601, 799 S.E.2d 912, 916 (2017) (quoting

*S.C. Pub. Serv. Auth. v. Ocean Forest, Inc.*, 275 S.C. 552, 554, 273 S.E.2d 773, 774 (1981)).  There is no evidence Weaver misled Appellants; in fact, the only contact Weaver had with Appellants shown by the record was when she led them to the scene of her grandmother's tragic demise.  We also point out that in support of their motion of dismiss, Appellants state Weaver has not alleged Appellants were aware of her or had "purposefully directed any conduct towards" her.  This portrayal of Weaver as a stranger to Appellants contradicts their depiction of her, in their equitable estoppel argument, as actively exploiting the residency agreement by looting its benefits.  Equity does not reward irony.

We conclude Appellants may not use equitable estoppel to bind Weaver to the arbitration provision.  Because no valid arbitration agreement existed between Appellants and Weaver, we affirm the denial of the motion to compel arbitration.

## II.

Appellants have also appealed the denial of their Rule 12(b)(6), SCRCP, motions to dismiss Weaver's claims for failure to state a cause of action.  Denials of Rule 12(b)(6) motions are not immediately appealable, and we decline to exercise our discretion to address them as we believe the issues raised would benefit from further factual development.  We decide this case without oral argument.  Rule 215, SCACR.

**AFFIRMED.**

**WILLIAMS and KONDUROS, JJ., concur.**