# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Jessica Bennett and Thuy N. Gasser, individually and on behalf of those similarly situated, Respondents,

v.

ACS Primary Care Physicians-Southeast P.C., Appellant.

Appellate Case No. 2021-001342

———————

Appeal From Horry County
Steven H. John, Circuit Court Judge

———————

Opinion No. 6089
Heard May 6, 2024 – Filed September 18, 2024

———————

## REVERSED AND REMANDED

———————

A. Victor Rawl, Jr., Julie Christine Fekete, and Nosizi Ralephata, all of Gordon & Rees LLP, of Charleston, for Appellant.

William Camden Lewis, of Columbia, and Christopher James Moore, of Florence, both of Richardson Thomas, LLC, for Respondent Jessica Bennett.

Ian Andrew Taylor, of Morris Law Firm, of Surfside Beach; Robert Morris Hadden, of Hadden Law Firm, LLC, of Mount Pleasant; Joseph Clay Hopkins, of Charleston; and Jeffrey D. Morris, of Myrtle Beach, for Respondent Thuy N. Gasser.

———————

**GEATHERS, J.:** In these two consolidated appeals, Appellant ACS Primary Care Physicians-Southeast P.C. (Provider) seeks review of the circuit court's orders denying Provider's respective motions to compel arbitration. Provider argues that Respondents, Jessica Bennett and Thuy N. Gasser (collectively, Insureds), are estopped from avoiding the application of the arbitration provisions in Provider's respective contracts with Insureds' health insurer, Blue Cross Blue Shield of South Carolina (Insurer), because Insureds seek to enforce the contracts based on their status as third-party beneficiaries. We reverse and remand for orders compelling arbitration and staying Insureds' claims.

## FACTS/PROCEDURAL HISTORY

According to Jessica Bennett's Class Action Complaint, on December 16, 2018, Provider's medical professionals treated Bennett in the emergency room at Mary Black Memorial Hospital in Spartanburg for injuries Bennett suffered in a car accident. Bennett was covered under a health insurance policy issued by Insurer through her employer. Insurer and Provider had previously entered into an Individual Preferred Provider Agreement allowing Provider the benefits of becoming a "Network Provider" and requiring Provider to file claims for covered services with Insurer and to accept negotiated rates for covered services. Nonetheless, instead of filing a claim with Insurer for services rendered to Bennett, Provider billed Bennett directly for $1,050.00, applying rates that were higher than the rates negotiated with Insurer.

Similarly, according to Thuy Gasser's Class Action Complaint, in December 2019, Provider's medical professionals treated Gasser in the emergency room at Grand Strand Regional Medical Center in Myrtle Beach for injuries Gasser suffered in a car accident. Gasser was covered under a health insurance policy issued by Insurer through an individual health insurance exchange. Insurer and Provider had previously entered into an Individual Health Insurance Exchange ("HIX") Preferred Provider Agreement allowing Provider the benefits of becoming a "HIX Network Provider" and requiring Provider to file claims for covered services with Insurer and to accept negotiated rates for covered services.[1] Nonetheless, instead of filing a claim with Insurer for services rendered to Gasser, Provider billed Gasser directly for $1,622.00, applying rates that were higher than the rates negotiated with Insurer.

---

[1] For purposes of analyzing the issues in this case, we will refer to Provider's respective contracts with Insurer collectively as the "Provider Agreements."

On March 17, 2020, Bennett filed one of the two class actions underlying these consolidated appeals, asserting claims for breach of contract (based on each putative class member's status as a third-party beneficiary of the Provider Agreement),[2] unjust enrichment, and "Equity." On May 21, 2020, Gasser filed the second class action, asserting claims for breach of contract/third-party beneficiary and unjust enrichment. After both actions were removed to federal court and subsequently remanded to the circuit court, Provider filed its respective motions to compel arbitration and stay or dismiss Insureds' claims. In its supporting briefs, Provider asserted that Insureds were bound by the respective arbitration provisions in the Provider Agreements because their assertion of third-party beneficiary status estopped them from avoiding those provisions.

The circuit court denied the respective motions, concluding that Insureds were "completely unaware that the [Provider Agreements] existed when [they] received [their] medical treatment." Subsequently, the circuit court denied Provider's motion for reconsideration in Bennett's class action.[3] These appeals followed.

**STANDARD OF REVIEW**

---

[2] *See Hardaway Concrete Co. v. Hall Contracting Corp.*, 374 S.C. 216, 225, 647 S.E.2d 488, 492–93 (Ct. App. 2007) ("[I]f a contract is made for the benefit of a third person, that person may enforce the contract if the contracting parties intended to create a direct, rather than an incidental or consequential, benefit to such third person." (quoting *Bob Hammond Constr. Co. v. Banks Constr. Co.*, 312 S.C. 422, 424, 440 S.E.2d 890, 891 (Ct. App. 1994))).

[3] There is nothing in the record to indicate that Provider filed a motion for reconsideration in Gasser's class action. However, at that stage of the litigation, Bennett and Gasser had been represented by the same attorney, who had filed identical motions to compel in each action, and the circuit court judge, who heard the same motions in both actions, had already denied Bennett's motion for reconsideration when he denied Gasser's motion to compel. Under these circumstances, filing a motion for reconsideration in Gasser's action would have been futile. Therefore, we consider the issues raised by Gasser but not addressed by the circuit court adequately preserved for review. *See Staubes v. City of Folly Beach*, 339 S.C. 406, 414–15, 529 S.E.2d 543, 547 (2000) (finding that a Rule 59(e), SCRCP, motion was not warranted under the circumstances of the case and stating, "This [c]ourt does not require parties to engage in futile actions in order to preserve issues for appellate review").

"The determination of whether a claim is subject to arbitration is subject to de novo review." *Aiken v. World Fin. Corp. of S.C.*, 373 S.C. 144, 148, 644 S.E.2d 705, 707 (2007). "Nevertheless, a circuit court's factual findings will not be reversed on appeal if any evidence reasonably supports the findings." *Id.*

## LAW/ANALYSIS

### I.  Equitable Estoppel

Provider maintains the circuit court erred by concluding that Insureds' purported lack of knowledge of the Provider Agreements when they received medical care precluded the application of equitable estoppel to them. Provider argues that even if Insureds had provided evidence to support this conclusion, it does not matter to the equitable estoppel analysis because Insureds knew about the Provider Agreements when they filed their complaints seeking to enforce them.[4] Provider further argues that Insureds' attempt to enforce these contracts amounts to an exploitation of the contracts for purposes of equitable estoppel. We agree with all of these arguments.

---

[4] There is no evidence appearing in the record indicating that Insureds were unaware of the Provider Agreements when they received medical care. Further, at least one court has rejected a similar argument:

> [The purchaser's predecessor] contended that it had no knowledge of, and so could not be bound by, the "General Conditions" (containing the arbitration clause) assertedly made part of the [manufacturer-distributor] contract. The district court rejected this argument, reasoning that because [the purchaser's predecessor] sought "to take advantage of certain commitments that were made by [the manufacturer] to" [the distributor] in the [manufacturer-distributor] contract, it was bound by all commitments in that contract, including the arbitration provision.

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 415 (4th Cir. 2000). The Fourth Circuit upheld the district court's ruling that the purchaser "cannot seek to enforce those contractual rights and avoid the contract's requirement that 'any dispute arising out of' the contract be arbitrated." *Id.* at 418.

> [E]quitable estoppel . . . estops a nonsigner from refusing to comply with an arbitration provision of a contract if (1) the nonsigner's claim arises from the contractual relationship, (2) the nonsigner has 'exploited' other parts of the contract by reaping its benefits, and (3) the claim relies solely on the contract terms to impose liability.

*Weaver v. Brookdale Senior Living, Inc.*, 431 S.C. 223, 230, 847 S.E.2d 268, 272 (Ct. App. 2020) (citing *Wilson v. Willis*, 426 S.C. 326, 340–44, 827 S.E.2d 167, 175–77 (2019)).

> In the arbitration context, the doctrine [of direct benefits estoppel] recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has *consistently maintained that other provisions of the same contract should be enforced to benefit him*.

*Pearson v. Hilton Head Hosp.*, 400 S.C. 281, 290, 733 S.E.2d 597, 601 (Ct. App. 2012) (quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000)). "[W]here plaintiffs sue and seek relief based on contracts containing arbitration clauses, courts have applied equitable estoppel." *Wilson*, 426 S.C. at 344, 827 S.E.2d at 177 (citing *Int'l Paper*, 206 F.3d at 417–18).[5]

---

[5] *See also Thompson v. Pruitt Corp.*, 416 S.C. 43, 57, 784 S.E.2d 679, 687 (Ct. App. 2016) ("[A] third-party beneficiary to an arbitration agreement cannot be required to arbitrate a claim *unless the third party is attempting to enforce the contract* containing the arbitration agreement." (emphasis added) (quoting *Dickerson v. Longoria*, 995 A.2d 721, 742 (Md. 2010))); *Georgia Power Co. v. Partin*, 727 So.2d 2, 5 (Ala. 1998) ("[A] contract made for the benefit of a third person may, at his election, be accepted and enforced by him. However, '[i]f he claims the benefits [of the contract], he also assumes the burdens.' 'The law is clear that a third[-]party beneficiary is bound by the terms and conditions of the contract that it attempts to invoke. "The beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract."'" (citations omitted) (quoting *Michie v. Bradshaw*, 149 So. 809, 814 (Ala. 1933) and *Interpool Ltd. v. Through Transport Mut. Ins. Ass'n Ltd.*, 635 F.Supp. 1503, 1505 (S.D. Fla. 1985))); *id.* (holding that because the plaintiff brought his breach-of-contract claim as a third-party beneficiary of the operations agreement between the corporate defendant and a second corporation, he chose "to accept and enforce all of its terms, including the arbitration clause that he seeks to

"When a claim depends on the contract's existence and cannot stand independently—that is, the alleged liability 'arises solely from the contract or must be determined by reference to it'—*equity prevents a person from avoiding the arbitration clause that was part of that agreement*." *Wilson*, 426 S.C. at 343, 827 S.E.2d at 176 (emphasis added) (quoting *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 637 (Tex. 2018)).

Accordingly, in examining a claim of equitable estoppel in the arbitration context, the court must determine the source of the defendant's duty to the plaintiff as alleged in the complaint. Here, in paragraphs 62 and 63 of her complaint, Bennett alleged, "By failing to bill [Insurer] directly, Defendant breached its Provider Agreement with [Insurer], including the covenant of good faith and fair dealing[,]" and Bennett "and members of the class are third-party beneficiaries of the breached Provider Agreement." In paragraphs 66 and 67, Bennett alleged that Provider's breaches had deprived Bennett and class members of "benefits they paid for through their health insurance with [Insurer]" and that they were "entitled to recover damages from [Provider] for breach of contract arising from [Provider's] breaches." We note that Bennett's contract with Insurer is not in the record, and nothing in the record suggests that Bennett is precluded from seeking reimbursement or other relief from Insurer.

Further, in paragraphs 69 through 75 of the complaint, i.e., Bennett's unjust enrichment claim, she asserted that had Provider complied with the Provider Agreement's terms rather than billing her at a rate higher than the agreed-upon rate, Provider would have received less money for the services it provided to Bennett, and therefore, she was entitled "to recover the increased rates." In her "Equity" claim, paragraphs 76 through 79 of the complaint, Bennett based her request for "appropriate" equitable relief on her allegation that Provider "thwarted contractual obligations to take advantage of individuals coming to them for medical emergencies." Therefore, Bennett pled all of her claims as being based on an alleged duty arising *solely* from the terms of the Provider Agreement. *See Wilson*, 426 S.C. at 343, 827 S.E.2d at 176 ("When a claim depends on the contract's existence and

avoid"); *Dist. Moving & Storage Co. v. Gardiner & Gardiner, Inc.*, 492 A.2d 319, 323 (Md. Ct. Spec. App. 1985) (holding that a warehouse lessee "should not be allowed to sue for breach of the contracts between [the lessor] and [the architectural firm and contractors] and thus benefit from those agreements without equally being made to abide by the terms of the contracts compelling arbitration of disputes arising therefrom"), *aff'd sub nom. Dist. Moving & Storage, Inc. v. Fedco Sys., Inc.*, 508 A.2d 487 (Md. 1986) (per curiam).

cannot stand independently—that is, the alleged liability 'arises solely from the contract or must be determined by reference to it'—*equity prevents a person from avoiding the arbitration clause that was part of that agreement*." (emphasis added) (quoting *Jody James Farms*, 547 S.W.3d at 637)).

Likewise, in Gasser's breach of contract claim, paragraphs 35 through 39 of her complaint, she alleged that Provider "breached its contract with [Insurer], [Gasser], and the other class members, as third-party beneficiaries, by refusing to submit claims to [Insurer]. [Provider] deprived Ms. Gasser of the benefits of the discounts and other provisions negotiated between [Insurer] and [Provider]." As with Bennett's contract with Insurer, Gasser's contract with Insurer is not in the record, and nothing in the record suggests that Gasser is precluded from seeking reimbursement or other relief from Insurer.

Further, in paragraphs 40 through 45, Gasser's unjust enrichment claim, she alleged that Provider was unjustly enriched by collecting payments from her and the putative class members "in contradiction to the agreed upon price for services bargained for between [Provider] and [Insurer]" and "[e]quity demands that [Provider] be compelled to return its ill-gotten gains." As with all of Bennett's claims, all of Gasser's claims were pled as being based on an alleged duty arising *solely* from the Provider Agreement. *See Wilson*, 426 S.C. at 343, 827 S.E.2d at 176 ("When a claim depends on the contract's existence and cannot stand independently—that is, the alleged liability 'arises solely from the contract or must be determined by reference to it'—*equity prevents a person from avoiding the arbitration clause that was part of that agreement*." (emphasis added) (quoting *Jody James Farms*, 547 S.W.3d at 637)).

Insureds maintain that South Carolina does not recognize direct benefits estoppel. However, this court applied the doctrine of direct benefits estoppel in *Pearson v. Hilton Head Hospital*, 400 S.C. 281, 733 S.E.2d 597 (Ct. App. 2012), and our supreme court discussed the doctrine at length in *Wilson*. 426 S.C. at 339–45, 827 S.E.2d at 174–77. In *Wilson*, an insurance agent's customers brought an action against the agent, her employer, and several insurers for fraud, conversion, and unfair trade practices. *Id.* at 331–32, 827 S.E.2d at 170. The insurers argued that the customers were estopped from asserting that they were nonsignatories to the agency agreement between the insurers and the agent's employer that included the arbitration clause at issue. *Id.* at 332–33, 827 S.E.2d at 171. Our supreme court stated that general principles of South Carolina law formed the basis for the customers' claims alleging misconduct that did not arise from the agency agreement. *Id.* at 342, 827 S.E.2d at 176.

Thus, rather than rejecting direct benefits estoppel, the *Wilson* court applied the doctrine to the facts before it and concluded that any benefit the plaintiffs may have received from the insurance agency agreement was indirect at best:

> In our view, Petitioners have not knowingly exploited and received a direct benefit from the Agency Agreement. As originally found by the circuit court, the Agency Agreement executed by Southern Risk and the Insurers was purely for the benefit of the parties to the contract in outlining their business relationships and the rights of the parties to the Agency Agreement. Petitioners *have not attempted to procure any direct benefit from the Agency Agreement itself while attempting to avoid its arbitration provision.*

*Id.* at 344–45, 827 S.E.2d at 177 (emphasis added). The court declined to address the plaintiffs' argument that South Carolina's traditional equitable estoppel test had to be applied to the case because that test was not argued before the circuit court:

> Petitioners assert, as an alternative argument on appeal, that the traditional state test for equitable estoppel enumerates six factors for consideration, and they further argue the traditional state test has not been met here because they have not engaged in false or misleading conduct that caused injury to Respondents, nor have Respondents claimed they lacked knowledge of the facts in question, relied upon the conduct of Petitioners, and suffered a prejudicial change of position. *The traditional test referenced by Petitioners has been analyzed most often in non-arbitration cases.* We find this assertion is not properly before the [c]ourt, as the parties and both courts below focused their discussions on whether the direct benefits test for estoppel had been met. Consequently, we also apply the direct benefits test and express no opinion on Petitioner's alternative argument.

*Id.* at 340 n.9, 827 S.E.2d at 175 n.9 (emphasis added) (citations omitted).

Here, Provider notes that in addition to Insureds' attempt to enforce the Provider Agreements, their admissions in their respective complaints that they received direct benefits from the Provider Agreements preclude them from avoiding the arbitration provisions in these agreements. Bennett's complaint alleges that she received "direct benefits from the Provider Agreement, including[,] but not limited to: not receiving bills directly from an in-network provider, and the costs of the services by an in-network provider being limited to [Insurer's] negotiated rates." Further, Gasser's complaint alleges that Provider "deprived Ms. Gasser of the benefits of the discounts and other provisions negotiated between [Insurer] and [Provider]."

Based on the foregoing, Insureds are equitably estopped from avoiding the arbitration provisions in the Provider Agreements.[6]

## II.      Issues not addressed by the circuit court

Provider also raises several issues that it raised before the circuit court when it submitted its respective motions to compel and its motion for reconsideration but on which the circuit court declined to rule. We address these questions in turn.

### A.      Bilateral arbitration

Provider asserts that Insureds' claims are subject to bilateral, rather than class, arbitration. However, nothing in the record indicates that Insureds have even requested class arbitration. Rather, they categorically oppose arbitration. Therefore, the question is hypothetical and, thus, unripe for judicial review. *See Jowers v. S.C. Dep't of Health & Env't Control*, 423 S.C. 343, 353–54, 815 S.E.2d 446, 451 (2018) ("We have explained ripeness by defining what is not ripe, stating 'an issue that is contingent, hypothetical, or abstract is not ripe for judicial review.'" (quoting *Colleton Cnty. Taxpayers Ass'n v. Sch. Dist. of Colleton Cnty.*, 371 S.C. 224, 242, 638 S.E.2d 685, 694 (2006))).

### B.      FAA versus SCUAA

---

[6] We decline to address Provider's argument that the circuit court singled out the defense of arbitration, unlike other contract defenses to a third-party beneficiary claim, for suspect status. *See Earthscapes Unlimited, Inc. v. Ulbrich*, 390 S.C. 609, 617, 703 S.E.2d 221, 225 (2010) (holding that an appellate court need not address remaining issues when the resolution of a prior issue is dispositive).

Provider asserts that Insureds' claims are subject to arbitration pursuant to the FAA because the Provider Agreements evidence a transaction involving interstate commerce. *See* 9 U.S.C. § 2 ("A written provision in . . . a contract evidencing a transaction *involving commerce* to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." (emphasis added)). Although the subject transactions in Insureds' class actions likely involve interstate commerce,[7] the Provider Agreements' language requires arbitration subject to the SCUAA.

"*Unless the parties have contracted to the contrary*, the FAA applies in federal or state court to any arbitration agreement regarding a transaction that in fact involves interstate commerce, regardless of whether or not the parties contemplated an interstate transaction." *Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 538, 542 S.E.2d 360, 363 (2001) (emphasis added) (footnote omitted). "[T]he parties are free to enter into a contract providing for arbitration under rules established by state law rather than under rules established by the FAA." *Id.* at 539 n.2, 542 S.E.2d at 363 n.2. "The FAA preempts state laws that *invalidate* the parties' agreement to arbitrate '[b]ut it does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the [FAA] itself.'" *Id.* (emphasis added) (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989)). Section 4 of the FAA "does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that 'arbitration proceed *in the manner provided for in* [*the parties'*] *agreement*.'" *Volt*, 489 U.S. at 474–75 (quoting 9 U.S.C. § 4).

---

[7] Provider is a Georgia professional corporation, licensed to do business in Georgia, South Carolina, and Florida, and it does business in Georgia and South Carolina. Provider rendered healthcare services to Insureds, who are South Carolina residents, in South Carolina, but Provider contracted with a company organized under Florida law, HCFS Healthcare Financial Services, LLC (HCFS), to code and bill for Provider's services to patients. The patient's medical records, including the clinician's documentation, are transmitted from the facility where treatment was rendered, here in South Carolina, to HCFS's office in Alcoa, Tennessee. "Once the CPT code and corresponding charge are determined . . . , a bill is generated and sent to the payer from billing operations in Florida." Further, Insurer is a South Carolina mutual corporation, but a representative of HCFS stated in her affidavit that Provider negotiated the Provider Agreements "from a location other than South Carolina."

Here, the Provider Agreements' arbitration provisions include the requirement that the arbitration must be conducted in South Carolina.  Further, paragraph IX.J of both Provider Agreements states, "This Agreement shall be construed *and enforced* in accordance with the laws of the State of South Carolina." (emphasis added). Similarly, in *Volt*, the United States Supreme Court observed that the disputed contract "contained an agreement to arbitrate all disputes between the parties 'arising out of or relating to this contract or the breach thereof'" and "also contained a choice-of-law clause providing that '[t]he Contract shall be governed by the law of the place where the Project is located.'"  489 U.S. at 470.  Like the choice of law provision in the present case, the *Volt* contract's choice of law provision was separate from the arbitration provision, and the Court found that through this choice of law provision, the parties "agreed to abide by state rules of arbitration." *Id.* at 479.  The disputed project was located in California, which had enacted a statute permitting a court "to stay arbitration pending resolution of related litigation between a party to the arbitration agreement and third parties not bound by it, where 'there is a possibility of conflicting rulings on a common issue of law or fact.'" *Id.* at 471 (quoting Cal. Civ. Proc. Code Ann. § 1281.2(c) (West 1982)).  Pursuant to this statute, the California Superior Court denied the motion to compel arbitration and stayed arbitration proceedings pending the plaintiff's lawsuit. *Id.*  The United States Supreme Court affirmed the California Court of Appeal decision upholding the Superior Court's ruling, explaining,

> Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward.  By permitting the courts to "rigorously enforce" such agreements according to their terms, we give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind by the FAA.

*Id.* at 479 (citation omitted) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

Based on the foregoing, the parties must proceed to arbitration under the SCUAA.  However, we add a caveat:  To the extent that any one provision in the SCUAA would *invalidate* the Provider Agreements' arbitration provisions, that specific provision is preempted by the FAA. *See Munoz*, 343 S.C. at 538 n.2, 542 S.E.2d at 363 n.2 ("In *Soil Remediation Co. v. Nu–Way Envtl., Inc.*, 323 S.C. 454,

476 S.E.2d 149 (1996), we found an arbitration agreement that did not comply with the technical notice requirements of § 15-48-10(a) was nonetheless valid because the FAA included no such notice requirement. We did not address the impact of the parties' agreement that the state Arbitration Act would apply. We now clarify that the result in *Soil Remediation* hinged on the fact that application of state law would have rendered the arbitration agreement completely unenforceable under § 15-48-10(a)[,] which provides that a contract failing to comply with statutory notice requirements shall not be subject to arbitration. State law was therefore preempted *to the extent it would have invalidated the arbitration agreement*. The parties to a contract are *otherwise free to agree that our state Arbitration Act will apply* and this agreement shall be enforceable even if interstate commerce is involved." (emphases added)).

Insureds rely on section 15-48-10(b)(4) to support their additional sustaining ground that their claims are not subject to arbitration because this provision excludes insurance contracts from arbitration: "This chapter . . . shall not apply to . . . [a]ny claim arising out of personal injury, based on contract or tort, or to *any insured or beneficiary under any insurance policy* or annuity contract." (emphasis added). Although the FAA would otherwise preempt this provision based on its rendering an arbitration agreement completely unenforceable, the provision is protected by the federal McCarran-Ferguson Act. *See Cox v. Woodmen of World Ins. Co.*, 347 S.C. 460, 468, 556 S.E.2d 397, 402 (Ct. App. 2001) (holding that § 15-48-10(b)(4) "'reverse pre-empts' the FAA through application of the McCarran-Ferguson Act," which prohibits federal legislation from impairing any state law enacted for the purpose of regulating the insurance business unless the federal legislation specifically relates to the insurance business).

Bennett argues that the Provider Agreement corresponding to her case depends on her insurance contract with Insurer and this dependence brings the Provider Agreement within the coverage of section 15-48-10(b)(4). However, in *Cox*, this court held that section 15-48-10(b)(4) "is a specific exemption limited to entities within the insurance industry." 347 S.C. at 468, 556 S.E.2d at 402. Provider is not within the insurance industry as it employs medical professionals, including doctors.

Also, this court has held that section 15-48-10(b)(4) "was . . . intended to apply directly to an insurance contract." *Walden v. Harrelson Nissan, Inc.*, 399 S.C. 205, 210, 731 S.E.2d 324, 326 (Ct. App. 2012). The court explained, "The FAA and section 15-48-10(b)(4) conflict with one another only when a litigant seeks to enforce an arbitration agreement contained in an insurance policy governed by South

Carolina law." *Id.* Here, although the Provider Agreements facilitate Insurer's fulfillment of its insurance contracts with Insureds, it is not itself an insurance policy. Rather, the consideration for the Provider Agreements is Provider's enjoyment of the advantage of being designated a Network Provider (or Preferred Provider) in exchange for agreeing to accept certain rates as payment in full for services covered under Insureds' own contracts with Insurer. Therefore, section 15-48-10(b)(4) does not apply to Insureds' claims against Provider, which are all based on the Provider Agreements.

## C. Dismissal versus Stay of Insureds' Claims

Provider argues that Insureds' claims should be dismissed because all of them are subject to arbitration. We disagree. Section 15-48-20(d) of the South Carolina Code (2005) states,

> Any action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this section or, if the issue is severable, the stay may be with respect thereto only. When the application is made in such action or proceeding, the order for arbitration *shall* include such stay.

(emphasis added). The parties have not cited to any case law, and we have found none, interpreting this provision. However, our supreme court has held that the use of "shall" in a statute "means that the action is mandatory." *Wigfall v. Tideland Utilities, Inc.*, 354 S.C. 100, 111, 580 S.E.2d 100, 105 (2003). Further, the United States Supreme Court recently interpreted a comparable provision in the FAA, 9 U.S.C. § 4, and stated that the provision's use of the word "shall" "'creates an obligation impervious to judicial discretion.'" *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024) (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)). Therefore, we reject Provider's argument that the present action should be dismissed.

## III. Additional Sustaining Grounds

Recognizing that our decision today frustrates Insureds' desire for a jury trial, we exercise our discretion to address the issues they raise by way of additional sustaining grounds. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) ("It is within the appellate court's discretion whether to

address any additional sustaining grounds."). In section II.B of this opinion, we addressed the additional sustaining ground asserting that Insureds' claims fall within section 15-48-10(b)(4), which excludes insurance contracts from arbitration. *See supra* Section II.B. We address their remaining additional sustaining grounds below.

## A.     Scope of arbitration

Bennett argues that this court may affirm the denial of Provider's motion to compel arbitration on the ground that her claims do not fall within the scope of the Provider Agreement's arbitration provision. We disagree.

"A motion to compel arbitration made pursuant to an arbitration clause in a written contract should only be denied where the clause is not susceptible to any interpretation [that] would cover the asserted dispute." *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 597, 553 S.E.2d 110, 118–19 (2001). Here, the pertinent part of paragraph IX.M in the Provider Agreement states that Insurer and Provider "agree to meet and confer in good faith to resolve *any* problems or disputes that may *arise under this Agreement. . . .* In the event that the parties through mutual negotiation are not able to satisfactorily resolve any problem or dispute, . . . [Insurer] and [Provider] agree to arbitrate *such problem or dispute*." (emphases added).

Bennett maintains that these terms cover arbitration between Provider and Insurer only. If we were to adopt this argument, the concept of a non-signatory being estopped from avoiding an arbitration provision could never be enforced because most arbitration provisions will naturally reference the parties to the contract in which the arbitration provision is included. Further, a reasonable construction of the Provider Agreement's arbitration provision is that the word "any" in the phrase "any problems or disputes that may arise under this Agreement," covers not only disputes between Provider and Insurer but also disputes between a third party and either Provider or Insurer as long as the dispute arises under the Provider Agreement.

Moreover, most of the jurisdictions that have examined whether to apply equitable estoppel to third-party beneficiaries have not interpreted the disputed arbitration provisions as narrowly as Bennett does here. *See The Detroit Edison Co. v. Burlington N. & Santa Fe Ry. Co.*, 442 F. Supp.2d 387, 389 (E.D. Mich. 2006) (applying the following arbitration provision to third-party beneficiaries: "If a question or controversy arises between the parties concerning the observance, performance, interpretation, administration or implementation of any of the terms, provisions, or conditions contained herein or the rights or obligations of either party under this Agreement, such question or controversy shall in the first instance be the

subject of a meeting between the parties to negotiate a resolution of such dispute. If, within thirty (30) days after the meeting, the parties have not negotiated a resolution or mutually extended the period of negotiation, either party may seek resolution of the question or controversy pursuant to binding arbitration"); *Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 617 (Tenn. 2004) (applying the following arbitration provision to a third-party beneficiary: "If a dispute . . . arises between the parties of this Agreement involving a contention by either party that the other has failed to perform its obligations and responsibilities under this Agreement, then the party making such contention shall promptly give written notice to the other. Such notice shall set forth in detail the basis for the party's contention. . . . The other party shall within thirty (30) calendar days after receipt of the notice provide a written response seeking to satisfy the party that gave notice regarding the matter as to which notice was given. Following such response . . . if the party that gave notice of dissatisfaction remains dissatisfied, then that party shall so notify the other party and the matter shall be promptly submitted to inexpensive and binding arbitration in accordance with the Tennessee Uniform Arbitration Act . . ."); *Ga. Power Co. v. Partin*, 727 So.2d 2, 5 (Ala. 1998) (applying to a third-party beneficiary an arbitration provision stating that arbitration "would apply '[i]n the event of any dispute, difference of opinion[,] or controversy between the parties as to any question of fact which may arise under this Agreement,' if either party requested arbitration"); *Dist. Moving & Storage Co.*, 492 A.2d at 321 (applying to a third-party beneficiary an arbitration provision stating, "All claims, disputes and other matters in question between the parties to this Agreement, arising out of, or relating to this Agreement or the breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise").[8]

---

[8] *But see Rath v. Managed Health Network, Inc.*, 844 P.2d 12, 13 (Idaho 1992) (holding that the following provision did not apply to the plaintiffs: "'Any controversy *between the parties to this Agreement*' shall be settled informally, or through arbitration if the parties are unable to settle informally"); *id.* ("The trial court held that the [plaintiffs] were bound by the arbitration provision in the Agreement based on their status as third[-]party beneficiaries. However, the cases relied upon by the trial court are inapposite in the face of the language in the Agreement expressly limiting the arbitration clause to the 'parties' to the Agreement."). We do not find *Rath* persuasive because of the treatment it was given in *The Detroit Edison Co.*, 442 F. Supp. 2d at 392–93 (referencing *Rath* but declining to follow it) and in *Benton*, 137 S.W.3d at 618–19 (rejecting *Rath* because other cited opinions from Alabama, Pennsylvania, and Maryland relying on *Williston on Contracts* and the Restatement (Second) of Contracts "reflect the better-reasoned analysis").

Based on the foregoing, we view all of Bennett's claims as falling within the scope of the Provider Agreement's arbitration provision.

## B. Condition Precedent

Next, both Insureds argue the Provider Agreements' arbitration provisions include a condition precedent that cannot be met and, thus, they are unenforceable. The pertinent part of paragraph IX.M in both Provider Agreements states that Insurer and Provider "agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement. . . . In the event that the parties through mutual negotiation are not able to satisfactorily resolve any problem or dispute, . . . [Insurer] and [Provider] agree to arbitrate such problem or dispute." Insureds maintain that it is impossible to meet this condition because the scope of the arbitration provisions does not confer on them "pre-arbitration dispute resolution rights." We disagree.

For the same reasons that Bennett's claims fall within the scope of the arbitration provision in the Provider Agreement corresponding to her case, *see supra* Section III.A, the condition precedent in that provision (in both Provider Agreements) may be satisfied by a meeting and good faith negotiation between Insureds and Provider. Nothing in the arbitration provisions reveals an intent to require a jury trial for the Provider Agreements' enforcement in the event the condition for arbitration is not met. Additionally, it is illogical to infer such an intent given that a party who prefers a jury trial could too easily prevent the fulfillment of the condition. *Cf. Champion v. Whaley*, 280 S.C. 116, 121, 311 S.E.2d 404, 407 (Ct. App. 1984) ("Where a party's repudiation contributes materially to the nonoccurrence of a condition precedent to his duty of performance, the nonoccurrence of the condition is excused.").

Further, we find it instructive that the overwhelming case law applying the FAA requires the determination of whether a condition precedent to arbitration has been met to be made by an arbitrator rather than the courts.[9] *See BG Grp., PLC v.*

---

[9] We have found no South Carolina case law interpreting the SCUAA on this question; therefore, we look to persuasive authorities from other jurisdictions interpreting the FAA. *See State Farm Mut. Auto. Ins. Co. v. Goyeneche*, 429 S.C. 211, 224, 837 S.E.2d 910, 917 (Ct. App. 2019) (stating that when there is no South Carolina case directly on point, our courts may look to persuasive authority from

*Republic of Argentina*, 572 U.S. 25, 34–35 (2014); *see also Chorley Enters., Inc. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 565 (4th Cir. 2015) ("As the Supreme Court has recently re-affirmed, . . . arbitrators—not courts—must decide whether a condition precedent to arbitrability has been fulfilled."); *id.* at 565 n.14 (listing three circuit opinions pre-dating *BG Group* and concluding those opinions were no longer controlling).[10]

> [C]ourts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration. These procedural matters include claims of "waiver, delay, or a like defense to arbitrability." And they include the satisfaction of "prerequisites such as time limits, notice, laches, estoppel, and other *conditions precedent* to an obligation to arbitrate."

*BG Grp.*, 572 U.S. at 34–35 (emphasis added) (citations omitted) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983) and *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002)).

In *BG Group*, the United States Supreme Court cited comment 2 to section 6 of the Revised Uniform Arbitration Act of 2000, which explains that this rule "reflects 'the holdings of the vast majority of state courts.'" 572 U.S. at 35. The Court also quoted section 6(c) itself, which states, in pertinent part, "An arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled." *Id.* We acknowledge that the SCUAA does not appear to have adopted section 6(c) of the Revised Uniform Arbitration Act. However, we have found no South Carolina case law addressing which forum should decide whether a condition precedent has been met.

Based on the foregoing, we hold that the condition precedent in the Provider Agreements' arbitration provisions may not serve as an obstacle to an order compelling arbitration.

### C.   Selected Forum Not Available

---

other jurisdictions as long as we do not apply them in a manner that conflicts with our supreme court's precedent).

[10] Insureds rely on the outdated opinions listed in note 14 of *Chorley*.

Bennett argues that the Provider Agreement's arbitration provision is unenforceable because the exclusive forum for arbitration is unavailable. Placing emphasis on certain cherry-picked phrases, she maintains that in 2003, the chosen forum, AAA, announced that "it would not administer *healthcare arbitrations between individual patients and healthcare service providers* that relate to medical services, such as negligence and medical malpractice disputes, *unless all parties agreed to submit the matter to arbitration after the dispute arose*."

On the other hand, Provider highlights the phrase "that relate to medical services, such as negligence and medical malpractice disputes." Provider also quotes the remainder of the announcement clarifying that AAA "will continue to administer arbitrations that involve solely **billing or collections matters** between an individual and a . . . healthcare provider," and "will administer disputes between patients and healthcare providers to the extent a **court order directs such a dispute to arbitration** where the parties' agreement provides for the AAA's rules or AAA administration." The full AAA Healthcare Policy Statement appears on the AAA website as follows:

> In 2003, the American Arbitration Association® ("AAA") announced that it would not administer healthcare arbitrations between individual patients and healthcare service providers that relate to medical services, such as negligence and medical malpractice disputes, unless all parties agreed to submit the matter to arbitration after the dispute arose. This policy is consistent with the *American Arbitration Association/American Bar Association/American Medical Association Due Process Protocol for the Mediation and Arbitration of Health Care Disputes*.

> However, the AAA will administer disputes between patients and healthcare providers to the extent a court order directs such a dispute to arbitration where the parties' agreement provides for the AAA's rules or AAA administration. In addition, the AAA will continue to administer arbitrations that involve solely billing or collections matters between an individual and a doctor or healthcare provider, although such billing or collections disputes may be governed by the *AAA's Consumer Rules and Consumer Due Process Protocol*.

> The AAA notes that this policy does not relate to or impact the administration of all other types of disputes in the healthcare field, such as disputes among providers, healthcare companies, insurance carriers and related entities. For more information on the AAA's administration of these types of cases and the *AAA's Healthcare Payor Provider Arbitration Rules*, please visit **www.adr.org.**

https://www.adr.org/sites/default/files/document_repository/AAA_Healthcare_Policy_Statement_0.pdf (last visited May 22, 2024).

Based on the foregoing, we reject Bennett's argument that the selected forum is unavailable.

### D.    Unconscionability

Finally, Gasser asserts that the Provider Agreement's arbitration provision is unconscionable because she had "no meaningful choice in accepting" the Provider Agreement's terms and this contract contains "unreasonable, oppressive, and one-sided terms." Throughout this section of her brief, Gasser vacillates between characterizing the arbitration provision as unconscionable and characterizing the entire Provider Agreement as unconscionable. For example, Gasser asserts that after Insurer has published Provider's name as a network provider allowing discounted rates, it would be unconscionable to preclude her from enforcing her claims in court. This argument is not directed at the arbitration provision's terms themselves but rather pertains to whether she should be equitably estopped from avoiding the arbitration provision, which we have already addressed. We confine the following analysis to whether the arbitration provision itself is unconscionable.

In *York v. Dodgeland of Columbia, Inc.*, this court defined unconscionability as,

> "the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." Thus, unconscionability is "due to *both* an absence of meaningful choice and oppressive, one-sided terms."

406 S.C. 67, 85, 749 S.E.2d 139, 148 (Ct. App. 2013) (citation omitted) (quoting *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 24–25, 644 S.E.2d 663, 668–69 (2007)).  In the context of arbitration agreements, courts should "focus generally on whether the arbitration clause is geared towards achieving an unbiased decision by a neutral decision-maker."  *Simpson*, 373 S.C. at 25, 644 S.E.2d at 668 (citing *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999)).  "It is under this general rubric that we determine whether a contract provision is unconscionable due to both an absence of meaningful choice and oppressive, one-sided terms."  *Id.* at 25, 644 S.E.2d at 669.

In the present case, the arbitration provision as a whole is "geared towards achieving an unbiased decision by a neutral decision-maker"[11] and does not rise to the level of unconscionability.  We will address each of the specific elements of unconscionability in turn.

### 1.      Absence of meaningful choice

We acknowledge that Gasser did not get to choose the language of the arbitration provision in the Provider Agreement.  Yet, nothing in the record suggests that Gasser ever tried to seek relief from Insurer.  Rather, she chose to file this class action based on a contract between two sophisticated parties, Insurer and Provider.  Therefore, the fact that she did not choose the language in the arbitration provision carries little weight in our unconscionability analysis.

### 2.  Oppressive and one-sided terms

Gasser argues, "it would be unconscionable to entice consumers to use the 'preferred' providers in the network . . . based on promises of the network price discounts, and then, in an undisclosed provision, remove the consumer's ability to seek legal redress for those healthcare providers who disregard their promises."  Likewise, Gasser asserts that Provider's contract violations were unforeseeable and the Provider Agreement was "invisible" to her.  In support of this assertion, she cites *Aiken v. World Fin. Corp. of S.C.*, 373 S.C. 144, 151, 644 S.E.2d 705, 709 (2007) for the proposition that the supreme court "will refuse to interpret any arbitration agreement as applying to outrageous torts that are unforeseeable to a reasonable consumer in the context of normal business dealings."

---

[11] *Simpson*, 373 S.C. at 25, 644 S.E.2d at 668.

These arguments are not directed at the terms of the arbitration provision themselves. In fact, Gasser does not cite any specific term that would hinder "an unbiased decision by a neutral decision-maker." *Simpson*, 373 S.C. at 25, 644 S.E.2d at 668. Further, we view the terms as particularly designed to achieve an unbiased decision by a neutral decision-maker. They provide for the application of AAA rules, require AAA to appoint an arbitrator who is knowledgeable in the healthcare management field, and prohibit the arbitrator from re-writing the Provider Agreement. They also require the arbitrator to follow legal contract construction rules to render any decision. Although the arbitration provision precludes certain remedies, i.e., "The arbitrator is prohibited [from] awarding any punitive, special[,] or consequential damages," these terms apply equally to all parties to the arbitration.[12]

Based on the foregoing, we reject Gasser's argument that the arbitration provision is unconscionable.

## CONCLUSION

Accordingly, we reverse the circuit court's respective orders in these two class actions and remand for orders compelling arbitration and staying Insureds' claims.

**REVERSED AND REMANDED.**

**HEWITT and VINSON, JJ., concur.**

**VINSON, J., concurring in result:**

I concur in the result reached by the majority and wish to emphasize that Insureds, through their pleadings, expressly asserted they were third-party beneficiaries of the Provider Agreement and, therefore, are required to arbitrate. Additionally, I agree that Insureds' breach of contract or breach of implied contract and unjust enrichment claims arose solely from the Provider Agreement in that Insureds alleged they did not receive the benefit of the negotiated rates under the Provider Agreement.

**HEWITT, J., concurs.**

---

[12] Unlike the arbitration provision challenged in *Simpson*, 373 S.C. at 28–30, 644 S.E.2d at 670–71, here, the arbitration provision in the Provider Agreement does not deprive the parties of any remedy specifically mandated by statute.